Milton G. JOHNSON, Personal Representative of the Estate of the Late Mahmood Naseem, Deceased, and Abdul Qadir Naseem

v.

## NATIONAL INSTITUTES OF HEALTH.

Civ. No. Y-74-796.

United States District Court,
D. Maryland.

Feb. 5, 1976.

Marvin Ellin, Baltimore, Md., for plaintiffs.

Parker B. Smith, Asst. U. S. Atty., Baltimore, Md., for defendant.

JOSEPH H. YOUNG, District Judge.

Milton G. Johnson, Personal Representative of the Estate of Mahmood Naseem (Mahmood), deceased, and Abdul Qadir Naseem (Naseem), father of Mahmood, seek damages from the National Institutes of Health under the provisions of 28 U.S.C. § 1346, popularly called the Federal Tort Claims Act.

This tragic saga began in Pakistan where Mahmood was born with a congenital heart defect, which severely limited his tolerance for exercise and retarded his development. Concerned about the welfare of his only son, Naseem, a teaching biologist in a pre-medical program in Pakistan, had Mahmood examined in several Pakistan hospitals. The infant's condition was diagnosed as Tetralogy of Fallot—the medical term for a congenital defect which develops between the left and right ventricle causing venous (blue) blood to flow into the aorta. This condition causes the heart to work harder and the body to receive less blood with adequate oxygen, resulting in a so-called "blue baby." Because of the complicated nature of corrective surgery procedures, it was recommended that the operation be performed in the United States.

Arrangements were completed to bring Mahmood to the National Heart and Lung Institute at defendant's loca-

tion in Bethesda, Maryland, where he was admitted on January 21, 1973. Various tests were performed, including a catheterization procedure on January 30, 1973, and it was decided that Mahmood should be transferred to defendant's surgery branch for a Blalock-Taussig shunt operation. This operative procedure is recognized medically as a palliative operation, intended to strengthen the patient so that further surgery can correct the congenital defect.

The operation was performed on February 6, 1973 by a team of surgeons headed by Dr. Andrew G. Morrow and including Dr. John W. Brown, Dr. Paul R. Hickey, and Dr. John A. Lecky, anesthetist. Dr. Morrow, Chief of the surgical branch at the Heart Institute, studied under Dr. Alfred Blalock who first performed the shunt operation at Johns Hopkins Hospital, and has performed approximately two hundred fifty such operations. He is recognized universally as one of the outstanding physicians in his field. Dr. Brown was clinical associate in heart surgery at NIH and is now on the staff of the University of Michigan. Dr. Hickey was associated with the coronary care unit at Columbia Presbyterian Hospital in New York and is now in charge of the coronary care unit of a Massachusetts hospital. Dr. Lecky is an Assistant Professor of Anesthesiology at University of Pennsylvania Medical School.

Following the operation, Mahmood was placed in the intensive care unit and was under the care of Dr. Brown. Approximately 24 hours later, on the morning of February 7, Dr. Brown, satisfied with the progress of the patient, had him removed from the intensive care unit to a semi-private room, where he continued to check on Mahmood's condition until that evening when he went off duty. While in the unit, X-rays were taken at five-hour intervals on February 6 and on February 7 the patient was taken to the X-ray department for additional X-rays. In the afternoon of February 7 the father complained to Drs. Brown, Colvin and Morrow about the lack of a monitor-

ing system, and was reassured by the doctors that all necessary precautions were being taken. Dissatisfied, the father complained to a fellow-Pakistani, Dr. Ayyub K. Omaya, a neurosurgeon on the staff at the National Institutes. Although Naseem testified that Dr. Omaya told him that his son was being neglected and that it was not an accepted practice to remove a patient from the intensive care unit within 24 hours of major surgery, Dr. Omaya's testimony in court does not substantiate that comment. In fact, Dr. Omaya testified that he tried to calm Naseem and told him that complications do occur. Naseem continued to express his concern and finally left the hospital on February 7 at 9:30 p. m. to spend the night with a friend. On February 8 Naseem received a call to come to the hospital and arrived there at approximately 7:15 a. m. He went to Mahmood's room and, over objections of the attending doctors, pushed his way into the room and found his son dead.

The autopsy protocol ascribed death to a variety of contributing factors, but indicated death was primarily due to aspiration of gastrointestinal contents causing cardio-respiratory arrest, all following the operative procedure of February 6.

Mahmood allegedly enjoyed a good post-operative night prior to his demise at 7:30 a. m. on February 8, 1973. At approximately 7:00 a. m. he was carried to a weighing scale in an adjoining corridor by a nurse and nursing assistant. When he was placed on the scales his eyes rolled back and he was immediately returned to bed and Dr. Brown was called for assistance. Upon arrival at the patient's bedside Dr. Brown found Mahmood cyanotic, gasping and with faint pulse. He observed no vomitus on the mouth or bed but could taste and smell vomitus when he initiated mouth to mouth resuscitation. Further emergency steps failed to revive the patient and he was pronounced dead at 7:30 a. m.

The jurisdiction of this Court is proper under 28 U.S.C. § 1346, and the alleged acts of negligence occurred in Montgom-

ery County, Maryland. Plaintiff, Milton G. Johnson, citizen and resident of the State of Maryland, was appointed Personal Representative of the Estate of plaintiff's decedent by the Circuit Court of Montgomery County on November 13, 1973.

Plaintiffs admit that the operation performed on February 6, 1973 was successful. They allege, however, that the defendant was negligent in the monitoring, supervision and maintenance of the decedent following the operation in that it administered improper dosages of morphine, failed to prescribe diuretics, failed to supply a proper supply of oxygen, exposed decedent to unnecessary risks by weighing him within 48 hours of the operation, failed to observe infiltration of the lungs, and in general failing to meet accepted standards of post-operative care.

Plaintiffs rely primarily upon the testimony of Dr. Theodore Rodman, Professor of Internal Medicine at Temple University Medical School, and Dr. Richard J. Chodoff, general surgeon, also from Pennsylvania. These experts, each endowed with an ability to perceive the exigencies of a case after the event—more frequently referred to as hindsight—detailed the steps that should have been followed to give Mahmood the standard of care required in a post-operative situation.

The more credible testimony of defendant's witnesses not only refuted each instance of alleged nonfeasance or malfeasance but set forth a series of procedures intended to equal or exceed the required standard of care.

A review of the medical records of Mahmood indicates that he was admitted to the intensive care unit immediately following the operation at approximately 11:30 a. m. on February 6. During the next 26 hours there are approximately 57 entries indicating individual medical attention. At approximately 1:30 p. m. on February 7, 1973 the patient was removed from the intensive care unit to a room located across the hall from a nurses' station. This decision was made by Drs. Brown and Hickey after consultation and finding that the patient was doing well post-operatively and no longer required the supportive features provided by the intensive care unit. Thereafter Mahmood's condition was monitored by various nurses and Drs. Hickey and Brown, and the records indicate approximately 16 separate entries covering the period following his removal from the intensive care unit until his death on February 8. Dr. Brown also testified that in addition to the recorded visits he, and others, made innumerable, unrecorded visits to Mahmood's room during his post-operative care.

Dr. John A. Lecky, anesthesiologist, who assisted in the operation, effectively discounted plaintiffs' theories related to the administration of morphine to Mahmood. He testified that the patient had a tendency to fight the supportive tubes in place after the operation and that these were removed to prevent struggling and unnecessary movement; that he saw no reason not to administer morphine as the drug of choice, and that adequate tests were performed to monitor the patient's condition. Dr. Lecky did observe that some doctors prefer more monitoring than others and suggested that following a shunt operation the risks of overtesting outweigh the benefits of the information obtained.

Plaintiffs' inconsistent attack on the care afforded the deceased is highlighted by their complaint that additional gas studies and other tests should have been performed—tests which Dr. Morrow considered painful and risky with no value in the care of shunt patients—and their claim that the deceased was exposed to unnecessary risks by causing him to be weighed within 48 hours of the operation—a test performed to observe fluid accumulation in a patient who had gained one pound within 24 hours of the operation, contrary to expected post-operative progress. Thus, plaintiffs protest the lack of certain tests, considered useless by the treating doctors, and decry the use of other tests, considered necessary by the same doctors. It is possible

to question certain tests and to second guess the use of some tests, but plaintiffs cannot carry their burden by such evidence. *See Riley v. United States,* 248 F.Supp. 95 (D.Md.1965).

It would serve no purpose to refer to the detailed testimony of the medical witnesses who testified for the defendant. But the comments of Dr. J. Alexander Halle, Jr., Chief of Children's Surgery at Johns Hopkins Hospital, with a background of 250 cardiac operations on children, put most of plaintiffs' claims in a proper perspective. Dr. Halle concluded that the care afforded to Mahmood was well within the required standards. He found no need for additional gas studies following a palliative operation inasmuch as the patient has a known blue-red blood situation. He considers morphine to be the drug of choice—most effective and best tolerated—in shunt operations and did not see any indication of excessive dosages. Dr. Halle placed no special significance on the white cell count since a high count is normal following any major operation, and observed that edema is an expected result of a successful shunt operation, resulting from the physical effects of the operation and the temporary inability of the heart to adjust to the increased blood supply. The evidence of pneumonia was spotty and not evident on X-ray. He considered the weighing procedure necessary to check the amount of fluid retained in the body and found no evidence of respiratory depression from the administration of any medication. Finding no valid indication that Mahmood died of pneumonia, he concluded that the postoperative care afforded the deceased met the standard of care of the community, a conclusion more than substantiated by a consideration of all the evidence.

■ The law relating to medical malpractice has been chronicled sufficiently to require no more than a passing reference to the principles as they must be applied to the facts of this case. To prove a malpractice case, the plaintiff has the burden of proving (1) the standard of medical skill and care ordinarily exercised in the particular locality, (2) a failure to observe that standard on the part of the physician or agent of the hospital, and (3) a showing that the defendant's failure to observe the proper standard was a direct cause of the death about which the plaintiff complains in the action. *Dunham v. Elder,* 18 Md. App. 360, 306 A.2d 568 (1972). Thus, the aggrieved party must show a lack of the requisite care or skill and that such failing was a direct cause of the loss. The amount of care required is such as is ordinarily exercised by others in the profession generally, and is a continuing obligation as long as the patient requires attention. If proof of either of the required elements is lacking, the case is not a proper one for submission to a jury or, if tried by the court without a jury, is susceptible to a finding adverse to the one who bears the burden of proof—the plaintiffs.

■ Thus, the legal principles are well established in cases such as this, and the ultimate decision rests upon the facts found from the evidence. That evidence shows that the defendant not only met or exceeded the requisite standard of care, but it afforded to Mahmood a level of medical skill and technology in a highly specialized field unavailable in most institutions today. The untimely and unfortunate death of Mahmood resulted from the uncertainties that accompany major surgery, however skillfully performed and carefully followed, and not from negligent acts of the defendant.

The findings herein shall constitute the findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure, whether or not so designated.

Accordingly, it is this 5th day of February, 1976, by the United States District Court for the District of Maryland, ordered:

That judgment be, and the same is, hereby entered in favor of the defendant, with costs.